## Commonwealth v. Williams

*W. Bertram Waychoff*, District Attorney; *R. Wallace Maxwell* and *William R. Davis*, special counsel, for Commonwealth.

*W. Robert Thompson*, for defendant.

TOOTHMAN, P. J., December 5, 1969.—State Mine Inspector, William L. Groves, filed a complaint charging Lewis Williams, an assistant mine foreman, employed at the time by U. S. Steel, Robena Mine, in Greene County, Pa., with violation of sections 218 and 306 of the Bituminous Mine Act of July 17, 1961, of this State, for ordering and directing the use of an 11BU mechanical loading machine which was in a defective condition. In the same complaint, he had also charged Edward F. Bailey, Benjamin F. Peters, Donald Crum and Michael Evosovich with operating or permitting the operation of the defective machine.

Defendant, Lewis Williams, was a salaried or noncontract employe, and the latter four were all union or contract employes. The incident precipitating the charge stemmed from an occurrence on the third shift, 12 p.m. until 8 a.m., on May 2, 1968, in the section of the huge underground mining operation known as seven, right flat, at Robena no. 3, otherwise known as the Frosty Run Shaft. After the shift was well underway, around 3 a.m., a chain broke on the conveyor transporting the coal from a gathering station at the foot of the mine to the above-ground cleaning plant. When this occurred, emergency procedures were initiated for the underground recovery of the coal, and loading was brought from the face in shuttle buggies, which change required the use of a loading machine, identified in the trade by its type and serial number as an 11BU, that resembles in appearance a medium sized dinosaur, and is operated electrically and hydraulically by one man. It is used to pick up coal from the floor, and to load it at a selected spot into coal cars or wherever needed. After the machine had been pressed into service, it started to "arc," meaning to create an electrical spark of considerable size when brought close to other metal objects, namely the shuttle buggies; and also, it would start and stop, unpredictably, as it was being used by its operator, one Donald Crum. The section mechanic, Michael Evosovich, was called. He removed the panel cover from the resistor box on the side of the machine that is roughly 18″ by 18″ in size. which contains metal resistor tubes inside it. Arnold L. Tarpley, Carl R. Kloock and Edward C. Yanik were all what are called "battery tractor operators," which is a phrase used synonymously with "shuttle cars" or coal haulage vehicles, that are used extensively in heavily mechan-

ized modern mining operations such as this one. They were all hauling back and forth from the face cutting and loading machines to the area near where the ill-fated 11BU was located. While Mr. Evosovich was trying unsuccessfully to fix the machine, together with assistant maintenance foreman Edward F. Bailey, they found that the machine could not be fixed inside, but that it would run when they inserted large wooden wedges to block the contactors from dropping down against the frame of the machine which had been causing the short, and this also allowed the electric circuit to energize the machine so that it could be used. Defendant mine foreman, in charge of five or six sections of the mine on that shift, including the section where the machine was down, having observed the futile attempts to fix it correctly so that the panel cover could be put back on, and the resistor tubes repaired, after asking the operator if he could use it that way, directed him to do so which he did for the rest of the shift, and then Mr. Williams reported the incident to the outside office. The machine was operating about 600 feet from the face of the mine, on what was identified as cross-cut 72, with approximately 55,000 cubic feet of air per minute moving in that area.

Section 306 of the Bituminous Coal Mine Act of July 17, 1961, P. L. 659, art. III, sec. 306, 52 PS §701-306, states:

"In the event of a breakdown or damage or injury to any portion of the electrical equipment in a mine, or overheating, or the appearance of sparks or arcs outside of enclosed casings, or in the event of any portion of the equipment, not a part of the electrical circuit, becoming energized, the equipment shall be disconnected from its source of power, the occur-

rence shall be promptly reported to a mine official, and the equipment shall not be used again until necessary repairs are made."

The same act, sec. 218, 52 PS §701-218, material to this case, provides in its relevant portions as follows:

"In order to secure efficient management and proper ventilation of the mines, to promote the health and safety of the persons employed therein, and to protect and preserve the property connected therewith, the operator or the superintendent shall employ a competent and practical mine foreman for every mine, who shall be under the supervision and control of the operator or superintendent. The mine foreman shall have full charge of all the inside workings and the persons employed therein, subject, however, to the supervision and control of the operator or superintendent, in order that all provisions of this act so far as they relate to his duties shall be complied with, and the regulations prescribed for each class of workmen under his charge carried out in the strictest manner possible. In gassy mines the mine foreman must possess a first grade mine foreman's certificate."

The criminal enforcement provision contained in the act is set forth in section 703, 52 PS §701-703:

"Any person who shall intentionally or carelessly disobey any order given in carrying out the provisions of this act, or do any other act whatsoever, whereby the lives or the health of the persons employed, or the security of the mine or the machinery, are endangered, or who neglects or refuses to perform the duties required of him by this act, or who makes any false statement in any report required by this act, or who is responsible for failure to comply with any decision made in accordance with this act, or who violates any of the provisions or requirements

thereof, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in the court of quarter sessions of the county in which the misdemeanor was committed, unless otherwise specified hereinbefore, be punished by a fine not exceeding two hundred dollars ($200), or imprisonment in the county jail for a period not exceeding three months or both, at the discretion of the court."

At the preliminary hearing, the four contract or union men were discharged and the noncontract man, Lewis Williams, was bound over for trial. The case was tried by the court without a jury after the waiver was duly filed. The Commonwealth presented its case in careful detail, it being represented by both the district attorney and specially appointed counsel for the Commonwealth. Defendant was ably represented by W. Robert Thompson, who fully and adequately developed the defensive position each step of the way, the main emphasis of which was his contention that it was not unsafe to operate the machine in its wedged state even though not properly repaired, and that in view of the distance it was located from the face, and the air flow in that area, even though the machine was in what would be considered a nonapproved state, its operation was safe, jeopardizing none of the men.

The court found defendant guilty of the first count, that of violation of section 218, but not guilty of the second count. Defendant filed a motion for a new trial and for judgment n.o.v., seeking a reflective review of the court's reasoning underlying the decision as made.

Working with a case such as this focuses our attention upon the dearth of judicial interpretation available under the provisions of the Bituminous Coal Mine Act, leading us to realize that there has been

a very limited use of the criminal provisions of the act, as well as the limited geographic area of the State where bituminous mining is such a prominent industry. For indeed, in this county we both recognize and respect its economic significance, as well as the need for an emphasis upon the industry to be made reasonably safe to insure, within reasonable limits, the well-being of all who serve it in various capacities, from the coal cutter clawing at the face, to the tipple man who loads the transport carriers. For the coal mines, and those who carve its tunnels and understand its hazards, it is a world and life apart, and for those who appreciate and respect it, it is a good life. But for all, it poses a difficult responsibility to enforce the laws, legislate the needs and regulate the standards so that safety in the mines can keep apace of production. In terms of training, machinery and the employment of new mining methods and techniques, we are confident that the safety factor has constantly improved.

The Bituminous Coal Mine Act is a carefully prepared legislative attempt, as we view it, to coerce a minimum standard of safe mining practices for the employment of men and machines in and around the mine. It is undergirded with requirements of experience and educational certification for key personnel. It is bolstered by the utilization of trained inspectors, and overall forms a code of mandatory directives to be carried out. Even this is overlaid by the Federal safety requirements as applied by the United States Bureau of Mines under the terms of the Federal Act being found in 30 U.S.C. §479, repealed December 30, 1969, 83 Stat. 803.

Quoting briefly from the introduction to the Bituminous Coal Mine Act, comprised of the Acts of 1943, 1961, and 1965, we find that coal is one of the

earliest known of many of Pennsylvania's rich deposits of natural resources:

"In 1788 Dr. Johann Schoepf in his book Travels in the Confederation described the strata of bituminous coal to be found on Coal Hill on the south side of the Monongahela River in the village of Pittsburgh. It appears to have been primitive, but nevertheless this was the beginning of the exploitation of the bituminous coal fields of western Pennsylvania, and these were the first entrances into the Pittsburgh seam, a body of coal which continues to be worked to the present day with no indication of exhaustion for generations to come": Page XV.

Further on, tracing the immense growth and change, we find this graphic account of the complex modern underground network of headings and passageways, indeed a coal mine is a veritable city out of sight, with tracks and rock beds, men and machinery in a constant churn of movement and activity, at page xix:

"In the general development of a mine, one or more main, parallel passageways, or 'headings,' are first driven through the coal seam at predetermined intervals and along predetermined lines. These main passageways are used to transport the coal, the men, and the supplies. They are also used as a means to circulate air in the mine. These headings are located to provide maximum service and convenience to the underground development and with due regard to outside facilities for handling coal. The next step of the development of a mine is to strike off, generally at right angles to the main headings, a series of secondary passageways or headings. These are termed 'flats' . . . At right angles to the flats are excavated another group of passageways known as 'rooms.' These rooms are cross-connected

by other passageways called 'breakthroughs.' When the advance into any particular tract of coal is complete, the blocks of coal outlined by this network of passageways are called 'pillars.' Extraction of the coal in these pillars is never complete in a deep mine but it is the last step in the development and exploitation of any particular body of coal . . .

"In an underground coal mine, any particular location from which coal is being removed is called a 'working place' or 'face.' The extraction of coal in driving the 'passageways' is termed 'development work.' Coal extraction from the pillars is 'rib line work.' Just as development is along predetermined lines so also is the rib line. Pillars are moved diagonally and in a flanking line. As the retreat is made, the stratum previously overlying the coal seam caves in on the void, and this is called the 'gob.'

"The extraction of the coal can be accomplished by various means. At present, the most modern are the track-mounted mechanical system and the track-less mechanical system. Whatever the system may be, the principal threats to the safety of coal mines include dangers of explosions of either coal dust, or explosions of the natural gas found at times in many mines, and almost constantly in 'gassy' mines; the danger of asphyxiation by gas or simple lack of fresh air and so of oxygen; the danger incident to the unavoidable use of explosives to break coal out of the seam; and finally, the dangers of premature collapse of the tunnels and excavations. All of these dangers can be reduced to completely tolerable levels by such things as proper planning of the excavation, proper workmanship, proper ventilation, and careful, experienced supervision and execution of the whole work, by competent people. All these things the Pennsylvania statute is designed to provide."

Thus, it can be noted that this sprawling underground, "unseen working city," is a complex pattern of passageways and headings and has the same need for regulation and careful supervision as the traffic controls and police requirements which are employed in urban areas above ground; and, in fact, to survive, this underground city must control its air immediately and prevent any contamination above unsafe levels; it must remove its "gob" or refuse quickly, it must keep under surveillance its fleet of shuttle cars, cutting machines, loading machines, haulage motors, pump and fan equipment, and the endless number of torches, tools and tracks that are the implements of the industry.

We then come to the case before us and the application of the specific provisions of the act brought into question by this proceeding. If we have probed too deeply into the background of the mining industry as well as the act applicable to it, it is because of our belief that in these matters, not generally understood by the average citizen who is not directly involved, we are dealing with a unique and important industry, without which plastics and synthetics as well as steel and power could not exist in as large a measure. Thus, we view the act in terms of the Latin axiom, "Qui haeret in litera haeret in cortice," which when translated means, "He who considers merely the letter of an instrument goes but skin deep."

As an aid in our interpretation of sections 218, 316, and 703 of the Bituminous Coal Mine Act, the Statutory Construction Act of May 28, 1937, P.L. 1019, art. IV, sec. 52(5), 46 PS §552(5), states this:

"That the Legislature intends to favor the public interest as against any private interest."

And also we note that section 558 of the same act provides:

"All provisions of a law of the classes hereafter enumerated shall be strictly construed:

"(1) Penal provisions;"

We, therefore, with these presumptions in mind, begin our analysis of section 218 by prefacing it with a definition of a mine foreman's duties as drawn from the introduction to the Mine Act, at page xxiii, as follows:

"Of all the officers constituted by the Mining Acts, the Mine Foreman carries the most specific and the most extensive statutory burdens, and is called upon to exercise the highest degrees of skill and judgment. By the statutes, the Mine Foreman is the legal manager of the mine underground. He is given a general mandate, by the provision that he shall have (Section 218):

" '. . . full charge of all the inside working and the persons employed therein, subject, however, to the supervision and control of the operator or the superintendent, in order that all the provisions of this act so far as they relate to his duties shall be complied with, and the regulations prescribed for each class of workmen under his charge carried out *in the strictest manner possible.*'

"And, in addition, he is charged with the ultimate personal responsibility to enforce himself or see to the enforcement of every one of a vast number of precautionary rules laid down for him by the statute. In mines where explosive gases are expected to accumulate, his burdens are greater, and his qualifications must be of a higher degree than in other mines." (Italics supplied.)

Therefore, in the instant case, when the 11BU broke down and the repairmen could not service it properly, under the terms of section 306 of the act we determine that this was clearly and patently a defective machine,

and should have been shut down. It is of no defense that at that particular time and at that particular place in the mine, there was no great immediate danger from the use of the 11BU without the resistor coils being properly operable, and the panel face left off, since the use of it in this fashion is considered by the act to be defective and dangerous, and, therefore, prohibited.

Section 316 of the act under the heading of "Electrical face equipment" gives us a definition of defective machinery as follows, in paragraph (h)(5):

"In any gassy portion of a mine, if any electric sparking or arc be produced, outside of a coal-cutting or other portable motor, or by the cables or rails, the machine shall be stopped, disconnected from the power supply, and not be worked again until the defect is repaired and the occurrence shall be reported to a mine official."

Paragraph (g) of section 316 provides:

"Explosion Tested Compartments. All explosion tested compartments shall be properly secured with cover clearance tolerances not exceeding four one-thousandths of an inch. Packing glands shall be correctly assembled and the packing compressed by a packing nut tightened to within one-eighth of an inch of its seat."

We cannot, from this rigid requirement specifically set out, find any other result but that this 11BU loading machine in its defective condition was used within a reasonable proximity of the working face (600 ft. approximately) wedged as it was for use in the crudest fashion in the resistor box with the cover plate left completely off. As the law does not condone it, and furthermore imposes upon the mine foreman the responsibility to know and apply its severest disciplines, when he was, as here, personally present and

did directly order and condone its use in this condition, we would be, in our opinion, shrinking from imputing reasonable legislative intent and purpose to the act if we were not to find him guilty of this violation. It is not significant that its use in this fashion at that distance from the face invited no immediate possibility of explosion, for that is purely speculative when, in fact, millions of dollars and man hours have been poured into the research and development of the kind of machinery that will be considered and is acknowledged to be used in the operation of a modern mine. This is what research and the statute, as well, state is a minimum safety standard for a mine to follow. In this case, much verbal attention and arguments on the law were given during the trial as to permissive equipment, a term used by State statute, but by whatever name we choose to identify this particular piece of equipment, in the fashion defendant ordered and authorized its use, unrepaired and unenclosed, it could not be considered by reasonable definition to be either permissible equipment or approved equipment.

This is not a case of a criminal act being charged to one in authority only because he had that authority. The mine foreman shoulders certain responsibilities in the work of a mine. Under the provisions of section 218, it is his duty to see that all provisions are carried out, including the provisions of sections 306 and 316. He here was right on top of this situation, and must, it follows, accept the responsibility. The question of the criminal fault of the other men who were discharged by the justice of the peace is not before us, but our view of this whole incident is that anyone who directs, aids or abets in the commission of an act prohibited by the Mine Act, or omits or permits the doing of an act required by it, is guilty of a violation

of the law, contract or noncontract, and one who gives the order for it to be done as well as one who does it, we believe, is guilty. In no other way will the Mine Act carry out its intended purposes, curtailment of production and extra cost involved notwithstanding.

We recognize the candor and uprightness of defendant, even though we believe he was at fault in this case. He, like the skipper of a large ocean-going vessel in a storm at sea, was no doubt subjected to much pressure in his own mind as to the best course to pursue when this situation arose. With the result of this case in mind, we can only hope that when other similar emergencies occur in the industry, this result can be a beacon light in determining the correct course to take.

We conclude by saying that we are mindful of the coal mine as being a stern taskmaster, but we are confident that man, in good conscience, can tame its troubles and create a climate of an attitude for safety as well as respect for regulations in its operation. As we know the industry rather intimately and respect it fully, we ask only that the industry respect the law, and we genuinely believe that its tonnage will be increased in the long run, and the work environment be made safer to the end that every man who enters or leaves its portals will do so with a renewed sense of pride and security.

## ORDER

And now, December 5, 1969, the motions for a new trial and for judgment n. o. v. are both overruled, and judgment entered on the verdict. Defendant shall appear in court at 10 a.m. December 15, 1969, for sentencing.